IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| BANK OF THE OZARKS, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **NO. 1:11-CV-02576-ODE** |
| ISHTIAQ A. KHAN, M. SHAILENDRA, | ) | |
| and RAHIM SABADIA, | ) | |
| | ) | |
| **Defendants** | ) | |

_____

**AMENDED ANSWER, COUNTERCLAIM, AND CROSS CLAIMS
OF
DEFENDANTS ISHTIAQ A. KHAN AND RAHIM SABADIA**
_____

COMES NOW, Ishtiaq A. Khan and Rahim Sabadia, and herein file this

their Answer, Counterclaim, and Cross Claims and show this Court the following:

### First Defense

Plaintiff has failed to state a claim upon which relief can be granted.

### Second Defense

Plaintiff is barred from recovery under the doctrine of mutual departure.

### Third Defense

Plaintiff is barred from recovery by virtue of novation.

**Fourth Defense**

Plaintiff is barred from recovery for failure of consideration.

**Fifth Defense**

Plaintiff is barred from recovery by virtue of the fraud perpetrated upon Khan and Sabadia by Shailendra, who owed a fiduciary duty to Khan and Sabadia, Park Avenue Bank ("PAB"), and PAB's officers and employees, including specifically PAB's Vice President Lee Spahos (the "Conspirators"), as alleged herein, and in particular the fraud inducing Khan and Sabadia to execute the note sued upon by Plaintiff in this action as well as the prior notes leading up to the note sued upon. More particularly, upon information and belief, Khan and Sabadia show the following:

(1)     The note sued upon by Plaintiff in this action as well as the prior notes leading up to the note sued upon were all signed by Khan and Sabadia as the result of the fraud perpetrated by the Conspirators to induce Khan and Sabadia to sign the notes.

(2)     The fraud took place over several years, and involved hundreds, if not thousands of transactions. Many, if not most of these transactions were secret, *i.e.*, concealed by the Conspirators from Khan and Sabadia. As to the transactions which were revealed to Khan and Sabadia, the Conspirators mislead Khan and

Sabadia about essential facts and concealed from Khan and Sabadia other essential facts, all with the intent of inducing Khan and Sabadia to rely upon the misrepresentations and to act as alleged herein to their detriment.

(3)     The transactions that lead to the signing of the note sued upon included the purchase of the three parcels of real property shown below and in greater detail in Exhibit A hereto, and included the following:



a.      **The purchase of Tract 1.** On or about June 20, 2003, Kiran Shailendra, Khan, Virginia Khan, The Sabadia Family Trust, and Kandathil

Mathew (the "Purchasers") purchased 11.3828 acres of real property ("Tract 1" (see above and Exhibit A hereto)) for approximately $512,000. All of the funds for the purchase were paid in cash by Sabadia.

      b.    **The purchase of Tract 2 and the making of the Tract 2 Loan.** On August 4, 2003, the Purchasers purchased an additional 150 acres (approximately) ("Tract 2" (see above and Exhibit A hereto)) for approximately $4,250,000, paying $1,000,000 in cash (paid by Sabadia[1]) and borrowing $3,350,000 from PAB for which Khan and Sabadia executed a note (the "Tract 2 Loan" (the PAB loan number ending in 1491)) secured by a Deed to Secure Debt on Tract 1 and Tract 2. The Tract 2 Loan matured on August 4, 2004, was renewed to mature in August, 2005, and renewed again to mature in August, 2006.

      c.    **The purchase of Tract 3 and the making of the Tract 3 Loan.** On July 19, 2004, the Purchasers purchased an additional 76.52 acres ("Tract 3" (see above and Exhibit A hereto)) for $1,570,000, paying $474,000 in cash (paid by Sabadia) and borrowing $1,255,000 from PAB for which Khan and Sabadia executed a note (the "Tract 3 Loan" (the PAB loan number ending in 1809)) secured by a Deed to Secure Debt on Tract 3.

---

[1] Sabadia contributed his portion of all transactions in cash, and signed notes only with indemnification agreements from Shailendra, as borrowing money with interest violates his religious principles, and PAB and its officers and employees were, at all times relevant hereto, aware of this arrangement.

d.    **Shailendra's Secret Loan 1.** Sometime prior to July 14, 2006, unbeknownest to Khan and Sabadia, PAB extended a personal unsecured line of credit to Shailendra ("Shailendra's Secret Loan 1" (the PAB loan number ending in 1181). On or about July 14, 2006, in furtherance of the conspiracy to defraud Khan and Sabadia, Shailendra, PAB, and Spahos fraudulently modified the security deed pledging Tract 1 and Tract 2 by increasing the indebtedness secured from $3,350,000 to $4,350,000, a change calculated to be virtually unnoticeable to Khan and Sabadia. In addition, whereas the 2004 and 2005 renewal notes evidencing the Tract 2 Loan and the corresponding deed to secure debt specifically referred only to the loan number (1491) for the Tract 2 Loan at the top of the page, the July 14, 2006 renewal (prepared and signed by PAB) referred not only to the loan number for the Tract 2 Loan but also, fraudulently, referred to the loan number (1181) for Shailendra's Secret Loan 1.

e.    **The Sale of Tract 2, the fraudulent payment of Shailendra's Secret Loan 1, and the theft of Khan and/orSabadia's share of the proceeds of the sale.** Sometime prior to July 14, 2006, Shailendra negotiated on behalf of the Purchasers to sell Tract 2. On or about September 28, 2006, the Purchasers sold Tract 2 for approximately $10,400,000. There were sufficient proceeds from the sale to pay off both the Tract 2 Loan and the Tract 3 Loan. The title commitment,

as part of the sale, required the pay off of both the Tract 2 Loan and the Tract 3 Loan. At the closing, PAB received $4,700,000, sufficient funds to pay off both the Tract 2 Loan and the Tract 3 Loan. However, in furtherance of the conspiracy to defraud Khan and Sabadia, and unbeknownst to Khan and Sabadia, PAB used $3,300,000 of the sales proceeds to pay off the Tract 2 Loan, approximately $800,000 to pay Shailendra's Secret Loan 1, and the balance (nearly $544,000) PAB deposited into Shailendra's personal PAB checking account (ending in the number 5808), with none of the proceeds being used to pay off the Tract 3Loan. Thus, as a result of the fraud perpetrated by the Conspirators, Khan and Sabadia remained purportedly liable to PAB on the Tract 3 Loan for $1,255,000 (which should have been paid), PAB and Shailendra were personally benefitted by the reduction of Shailendra's Secret Loan 1 in the amount of $800,000, and Shailendra was personally benefitted by the deposit into his personal account of $544,000. In essence, the Conspirators stole $1,344,000 of the proceeds of the sale of Tract 2 for their own benefit and at the expense and injury of Khan and Sabadia. In addition, on September 29, 2006, Shailendra deposited $866,605.14 into his personal account at PAB which consisted in part or in whole of Khan and/or Sabadia's share of the proceeds of the sale of Tract 2 which was never paid to Khan or Sabadia.

f.    **The fraudulently induced loan sued upon in this action**. In furtherance of the fraud perpetrated on Khan and Sabadia, on or about October 25, 2006, the Conspirators contrived to replace Shailendra's Secret Loan 1 with a loan on which Khan and Sabadia were obligated. To accomplish this, PAB and its officers and employees, and, in particular, Spahos, drew up new loan documents for a new loan ostensibly to renew and increase the Tract 3 Loan from $1,255,000 to $1,800,000. However, the note and disbursement authorization both indicated by loan number that the new "renewal note" was to renew both the Tract 3 Loan (1809) and Shailendra's Secret Loan 1 (1181), which, of course, neither Khan nor Sabadia could recognize at the time they signed the new note (the "Fraudulent Note" (the PAB loan number ending in 9085—the loan sued upon by Plaintiff in this action)). On or about October 26, 2006, the loan proceeds from the Fraudulent Note were disbursed as follows: $959,756.67 was used to pay off Shailendra's Secret Loan 1, $553,588.89 was used to pay off the Tract 3 Loan, and $215,000 of the balance of $279,724.44 (after subtracting various costs, such as title insurance) was deposited to Shailendra's personal checking account at PAB. The Conspirators misrepresented the nature of the loan, its purpose, and how the proceeds were to be used. Had Khan and Sabadia known the loan proceeds would be used as they were used, facts concealed from them by the Conspirators, they would never have

signed the Fraudulent Note or authorized the disbursement of the funds. Thus, as a result of the fraud perpetrated by the Conspirators, Khan and Sabadia were purportedly liable to PAB on the Fraudulent Note for $1,800,000 (although Khan and Sabadia dispute any such liability based upon the fraud alleged herein), PAB and Shailendra were personally benefitted by the reduction of Shailendra's Secret Loan 1 in the amount of $959,756.67, and Shailendra was personally benefitted by the deposit into his personal account of $215,000. In reality, the Conspirators stole $1,250,000 from Khan and Sabadia.

      g.    The second renewal of the Fraudulent Note in October 2008 (the specific note sued upon by Plaintiff in this action and hereinafter referred to as the "Fraudulent Renewal Note"), prepared by PAB, contains an express representation that the purpose of the loan was to inject equity into the investment. The representation was false, and known by the Conspirators to be false at the time it was made. Khan and Sabadia justifiably relied upon the representation, which was made for the purpose of inducing them to execute the Fraudulent Renewal Note.

      h.    PAB and its officers and employees, and, in particular, Spahos, knew at all times relevant hereto that Shailendra was in a position of trust and confidence with respect to Khan and Sabadia and relied upon and took advantage

of the fact that Shailendra exercised substantial influence over Khan and Sabadia, and that he could procure their execution of PAB loan documents without disclosing the true nature and effect of the documents. The Conspirators conspired to convert Shailendra's Secret Loan 1 into the Fraudulent Renewal Note Plaintiff seeks to recover upon in this action. The original Fraudulent Note, and the renewals of the Note, including the Fraudulent Renewal Note, were obtained as a direct result of the fraud perpetrated by the Conspirators upon Khan and Sabadia.

      i.    Shailendra benefitted from the fraud by (1) borrowing money from PAB and (2) having that loan repaid by Khan and Sabadia without their realizing it. PAB benefitted from the fraud by having Shailendra's loan repaid. PAB knew what Shailendra was doing, and aided and abetted him in doing it. In so doing, PAB preferred one borrower (Shailendra) over another (Khan and Sabadia), and enabled one borrower (Shailendra) to take advantage of another (Khan and Sabadia). PAB knew that Shailendra acted as investment advisor to Khan and Sabadia, that Khan was, and is, a physician with a busy office practice, and Sabadia was and is in the software business living in Orange County, California.

      j.    Lest there be any doubt as to the conspiracy involving "secret loans," the Conspirators perpetrated the same kind of fraud again in 2007, as shown below.

k.    **The Purchase of property by Shi Two.** Shailendra was the manager of Shi Investments Two, LLC ("Shi Two"), a limited liability company in which Khan and Sabadia were members. Shi Two purchased real property in January 2006 (the "Shi Two Property"). In that purchase, Shi Two borrowed $6,000,000 from PAB (the "Shi Two Loan" (the PAB loan number ending in 4163)), which was secured by the Shi Two Property and the guarantees of Khan, Sabadia, and Shailendra.

l.    **Shailendra's Secret Loan 2.** On or about August 2, 2007, the Conspirators conspired to increase the indebtedness secured by the Shi Two property by $1,000,000. This was accomplished by PAB making an additional $1,000,000 loan to Shi Two that matured on December 5, 2007 ("Shailendra's Secret Loan 2" (the PAB loan number ending in 3040)). Shailendra's Secret Loan 2 was unknown to Khan and Sabadia and the funds were identified in the books and records of Shi Two in the form of a general journal entry with the cryptic notation "Shi." The proceeds from the loan were deposited by PAB into the Shi Two account, immediately followed by a transfer of some of the funds to Shailendra's PAB personal checking account (5808).

m.    **The Sale of the Shi Two Property.** Prior to August 2, 2007, Shailendra, as manager of Shi Two, negotiated to sell the Shi Two Property. The

sale was closed on November 14, 2007. At closing, PAB authorized over $10,700,000 to be wired directly to the Shi Two account at PAB, where the Conspirators conspired to pay off both the Shi Two Loan and Shailendra's Secret Loan 2. Thus, the Conspirators again defrauded Khan and Sabadia by in effect stealing money from the sale of the Shi Two Property for the benefit of Shailendra and PAB and to the detriment of Khan and Sabadia.

(5)    The allegations set forth above, and those set forth in the Counterclaim below, which are incorporated herein by reference, show that PAB and its officers and employees were instrumentally involved in and aided and abetted the fraud committed against Khan and Sabadia, and PAB should not be permitted to recover upon the Fraudulent Renewal Note under such circumstances.

### Sixth Defense

Plaintiff is barred from recovery by virtue of the doctrine of waiver.

### Seventh Defense

Plaintiff is barred from recovery by virtue of the doctrine of estoppel.

### Eighth Defense

Plaintiff is barred from recovery because it is not a holder in due course of the Fraudulent Note, the Fraudulent Renewal Note, and the Notes are subject to the Defendants' claims, defenses, and rights of setoff and recoupment.

### Ninth Defense

Plaintiff's claims for attorney's fees are barred as an unenforceable penalty.

### Tenth Defense

Plaintiff is barred from recovery under the doctrine of ratification.

### Eleventh Defense

Plaintiff has failed to mitigate its damages.

### Twelfth Defense

Plaintiffs claims are barred by the doctrine of payment.

### Thirteenth Defense

Defendants respond to the enumerated allegations in Plaintiff's Complaint as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Admitted.

2.     Admitted.

3.     Defendants are without sufficient information to form a belief as to the truth of the allegations in this paragraph.

4.     Admitted.

5.     Admitted.

6.     Admitted.

## FACTUAL BACKGROUND

7.    Defendants admit to signing Exhibit "A," but are without sufficient information to form a belief as to the truth of any other allegations in this paragraph, including those purporting to characterize the document, or its content.

8.    Denied.

9.    Defendants admit Exhibit "A" contains such a provision, but denies it is applicable, or enforceable.

10.    Defendants deny any funds were extended to them under the Note, or its terms.

11.    Denied.

12.    Denied.

13.    Admitted.

14.    Admitted.

15.    Defendants are without sufficient information to form a belief as to the truth of the allegations contained in this paragraph.

16.    Admitted.

17.    Defendants are without sufficient information to form a belief as to the truth of the allegations contained in this paragraph.

18.    Denied.

19.     Defendants admit to receiving Exhibit "C," but deny any other allegation as to the force, effect, or content of such document, and further deny default, or indebtedness.

20.     Defendants are without sufficient information to form a belief as to the truth of the allegations in the paragraph, and further deny any indebtedness to Plaintiff.

21.     Defendants deny they are in default, and further deny they are in breach of the note.

## CAUSES OF ACTION

## COUNT I

## BREACH OF CONTRACT – PROMISSORY NOTE

### (Against All Defendants)

22.     Defendants incorporate their responses to the allegations of paragraphs 1-21 as if fully restated herein.

23.     Denied.

24.     Denied.

## COUNT II

## UNJUST ENRICHMENT

### (Against All Defendants)

25.     Defendants incorporate their responses to the allegations of paragraphs 1-21 as if fully restated herein.

26.     Denied.

## COUNT III

## ATTORNEYS' FEES AND EXPENSES PURSUANT TO O.C.G.A. §13-1-11

### (Against All Defendants)

27.     Defendants incorporate their responses to the allegations of paragraphs 1-21 as if fully restated herein.

28.     Defendants admit receiving notice of Plaintiff's intent to claim attorney's fees, but deny liability under O.C.G.A. §13-1-11.

### ALL OTHER ALLEGATIONS

29.     All other allegations contained in Plaintiff's Complaint not specifically admitted are hereby denied.

Wherefore, as to Plaintiff's claims, Defendants deny any indebtedness to Plaintiff, and respectfully pray that this Court dismiss Plaintiff's claims, and for such other and further relief deemed necessary and just.

## COUNTERCLAIM

COME NOW, Defendants Ishtiaq A. Khan, and Rahim Sabadia ("Defendants") and herein file this, their Counterclaim for Declaratory Judgment, Setoff and Recoupment, and show this Court the following:

1.      Over the course of several years, Shailendra engaged in a wide scale scheme to defraud Khan and Sabadia, and as alleged more particularly hereinbelow, to breach his fiduciary duty to Defendants.

2.      Shailendra, at all times relevant hereto, owed fiduciary duties to Khan and Sabadia.

3.      At all times relevant hereto, Park Avenue Bank ("PAB") was acting by and through its officers and employees, including, but not limited to Lee Spahos and Al Hosford (the "PAB Officers").

4.      At all times relevant hereto, the PAB Officers were aware of Shailendra's fiduciary duties to Khan and Sabadia.

5.      During the course of the banking relationship between Shailendra and PAB, and prior to the execution of the Note (Exhibit A to the Complaint), PAB and the PAB Officers were aware of Shailendra's scheme to defraud Khan and Sabadia.

6.      The scheme involved, among other things, the acquisition of property, funded by contributions made by Khan and Sabadia, and, undisclosed to them,

loans obtained by Shailendra from PAB, and other banks, secured by acquired

property, which funds were used as Shailendra's contributions for his personal

benefit.

7.      Specifically, PAB and the PAB Officers, were aware of, aided and abetted,

encouraged, and benefitted from, the following:

a.      The wrongful depositing of checks payable to the order of one entity into the

account of another entity or individual. For example:

> (i) On or about October 25, 2007, Georgia Transmission delivered to Shi
>
> Investments One, LLC its check payable to the order of Shi Investments
>
> One, LLC (a limited liability company of which Shailendra was the manager
>
> and Khan and Sabadia were members) ("Shi One") in the amount of
>
> $380,000.00 (the "Georgia Transmission Check"). Shailendra indorsed the
>
> Georgia Transmission Check and deposited the Georgia Transmission Check
>
> to his personal account at PAB. PAB accepted the deposit, credited
>
> Shailendra's personal account for the full amount of the deposit, presented
>
> the Georgia Transmission Check to the payor bank for payment, collected
>
> the proceeds of the Georgia Transmission Check, and gave the proceeds to
>
> Shailendra, all without the knowledge, consent, or approval of the owners of
>
> Shi One.  Thereafter, Shailendra used the proceeds of the Georgia

Transmission Check for his own purposes and not for any purposes associated with Shi One.

(ii) On April 1, 2008, Shailendra deposited to his personal account at PAB a check for $5,000.00 issued by Total Tennis Academy, LLC payable to the order of International Tennis Academy.

(iii) On September 16, 2008, Shailendra deposited to his personal account at PAB a check for $280,000.00 issued by Sachchidanand Properties, LLC payable to the order of Tanger Indian Creek, LLC.

(iv) On March 31, 2009, Shailendra deposited to his personal account at PAB a check payable to Shi Investments V (Butts Co.), LLC.

b.      The wrongful depositing or other use of checks drawn payable to the order of PAB for the benefit of someone other than the drawer of the check. For example:

(i) On or about November 26, 2004, a check issued by the Sabadia Family Trust for $100,000.00 payable to the order of PAB was deposited into Shailendra's personal account at PAB.

(ii) On December 15, 2006, a check issued by the Sabadia Family Trust for $500,000.00 payable to the order of PAB was deposited into Shailendra's personal account at PAB.

(iii) On January 11, 2007, Nafees El Batool drew a check against the account of Sabtech Industries, Inc. in the amount of $200,000.00 payable to the order of PAB, on January 12, 2007, drew two other checks against the account of Sabtech Industries, Inc. in the amounts of $100,000.00 and $200,000.00, respectively, each payable to the order of PAB, and on January 12, 2007, a check was drawn against the Sabadia Family Trust in the amount of $500,000.00, payable to the order of PAB, and on January 16, 2007, Shailendra deposited all four checks to his personal account at PAB.

(iv) On October 1, 2007, a check drawn against the Pinnacle at Eagles Point, LLC account at Heritage Bank in the amount of $200,000.00 payable to the order of PAB was deposited into Shailendra's personal account at PAB.

(v) On October 18, 2007, a check drawn against the Eagle Stockbridge, LLC account at MidFirst Bank in the amount of $600,000.00 payable to the order of PAB was deposited into Shailendra's personal account at PAB.

(vi) On September 2, 2008, Shailendra deposited a check in the amount of $892,390.00 payable to PAB into his personal account at PAB.

c.    The wrongful depositing of checks with missing or unauthorized indorsements.

d.    The improper transfers of funds to cover Shailendra's personal overdrafts.

For example:

(i) On January 5, 2007, at the urging, or at least in concert with the wishes, of the PAB Officers, Shailendra transferred $150,000.00 from the Shi Investments Two, LLC account at PAB to cover an overdraft in his personal account at PAB.

(ii) Three days later, on January 8, 2007, at the urging, or at least in concert with the wishes of, the PAB Officers Shailendra transferred $230,000.00 from the One Wisteria Place, LLC Money Market Account at PAB to cover another overdraft in his personal account at PAB.

(iii) Again, on February 9, 2007, Shailendra, at the urging, or at least in concert with the wishes, of the PAB Officers, transferred $110,000.00 from the Shi Investments Two, LLC account at PAB to cover an overdraft in his personal account at PAB.

(iv) On February 12, 2007, at the urging, or at least in concert with the wishes of, the PAB Officers, Shailendra transferred $175,000.00 from the 21 14th Street Two-Thirds, LLC, d/b/a 21 14th Street One-Third, LLC account to cover an overdraft in his personal account at PAB.

e.      The wrongful transferring of funds from account to account to pay loans or

other obligations owed by different entities. For example: On February 14, 2007,

Shailendra transferred $125,000.00 from the 21 14th Street Two-Thirds, LLC, d/b/a

21 14th Street One-Third, LLC account at PAB to Shailendra's personal account at

PAB to pay interest owed on a loan to PCB East Bay 1130, LLC.

f.      The daily transfer of massive amounts of funds by checks, intra-bank

transfers, and inter-bank funds transfers (wire transfers), many by telephone or

personal contact with bank employees, obviously made for no legitimate business

purpose but designed to give the illusion of substantial balances in the accounts

and to enable Shailendra to siphon funds out of the accounts for his own personal

use. During a period of approximately three years, from 2007 – 2010, over

$50,000,000 was deposited into Shailendra's personal account at PAB (5808).

During the same time, Shailendra wrote on this account approximately 623 checks

that were or would have been dishonored and returned for insufficient funds.

However, rather than allow the checks to go unpaid, PAB would notify Shailendra,

and instruct, request, or knowingly permit Shailendra to transfer to his account, to

cover the overdraft, money owned by an entity he managed or controlled but which

was owned by persons other than Shailendra. The total of all deposits made into

Shailendra's personal account just to cover overdrafts was nearly $8,000,000. The

accounts where the funds originated were owned by entities in which Shailendra was the manager, or otherwise controlled the funds. At all times relevant hereto, PAB was aware that the entities from which the funds were transferred to cover the overdrafts had members to whom Shailendra owed fiduciary duties.

g.      Allowing Shailendra to change the names of the account holders on accounts maintained by others.

8.      In order to continue his fraudulent scheme, Shailendra needed access to loans, which he was able to obtain as a result of the relationships he created and nurtured with the PAB Officers.

9.      PAB and the PAB Officers, were in possession of various operating agreements indentifying the other members of the various entities, in which Shailendra acted as manager.

10.      PAB and the PAB Officers were aware that the operating agreements prohibited Shailendra from self-dealing, or otherwise personally benefitting from the investments or projects.

11.      At all times relevant hereto, PAB and the PAB Officers were aware that Shailendra did not have the funds to repay the note sued upon in this case, or any of the other loans made to entities, guaranteed by Khan and Sabadia.

12.     Neither PAB, nor the PAB Officers, intended for, or expected any, of the notes executed or guaranteed by Khan and Sabadia to be paid off by the borrowers. It was intended, and was part of the course of dealing, that all loans would be continuously renewed until such time as the property securing each such loan, including the one Plaintiff has sued upon, was sold.

13.     In addition to the above, on hundreds, if not thousands of occasions, PAB, and the PAB Officers personally assisted Shailendra in making transfers in and out of his personal account and other accounts for the purpose of covering checks written on accounts that otherwise had insufficient funds.

14.     In addition to the above, on hundreds, if not thousands of occasions, PAB and the PAB Officers reversed charges to Shailendra's personal and other accounts for insufficient funds transactions.

15.     During the period of 2007 – 2010, Shailendra's transactions exceeded $50,000,000 in his personal account at PAB, many of which involved the personal participation of the PAB Officers.

**Count I - Declaratory Relief**

16.     Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

17.    As a result of the conduct alleged herein, both the note sued upon by Plaintiff (the "Note"), and the related Deed to Secure Debt, securing the Note, were obtained by fraud and deceit.

18.    As a result, Khan and Sabadia seek to cancel and rescind the Note and Deed to Secure Debt, and to have the Note and Deed to Secure Debt declared null and void and without effect.

19.    Plaintiff obtained the Note through an assignment from the Federal Deposit Insurance Corporation as receiver ("FDIC-R") for PAB.

20.    Prior to the assignment referenced above, and alleged in Plaintiff's Complaint, PAB and FDIC-R were informed of, and were aware at all times relevant hereto, of the defenses to the Note.

21.    At the time Plaintiff obtained the assignment of the Note from FDIC-R, it was overdue and, based upon its terms in the state of an uncured default.

22.    Based upon the foregoing, Plaintiff is not a holder in due course, and took the Note subject to the claims and defenses Khan and Sabadia could have asserted against PAB.

## Count II - Setoff and Recoupment

23.    Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

24.    By virtue of the allegations set forth herein, PAB and the PAB Officers aided and abetted Shailendra in breaching his fiduciary duties to Khan and Sabadia, and otherwise aided and abetted Shailendra in committing fraud against Khan and Sabadia.

25.    PAB and the PAB Officers conspired with Shailendra to procure the signatures of Khan and Sabadia on the Note, as well as other notes. In furtherance of this conspiracy, PAB and the PAB Officers aided and abetted breaches of fiduciary duties by Shailendra for the purpose of allowing him to appear to remain solvent, long after it was clear that he was not.

26.    As a result of the fraudulent conduct of PAB and the PAB Officers, Khan and Sabadia were harmed, including having been induced to sign the Note and Deed to Secure Debt.

27.    As a result of the conduct of PAB and the PAB Officers, acting in concert with Shailendra, Khan and Sabadia assert claims for complete setoff and recoupment against Plaintiff.

## Cross Claims against Defendant Shailendra

## Count I – Contribution

1.      Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

2.      In the event Khan and Sabadia are liable to Plaintiff on the Note, Khan and Sabadia are entitled to recover from Shailendra, his pro rata share of any such judgment actually paid by, or collected from, Khan and Sabadia, pursuant to O.C.G.A. §23-2-71.

## Count II – Breach of Fiduciary Duty

3.      Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

4.      Shailendra befriended Khan and Sabadia, and developed a close, personal relationship. As Khan and Sabadia came to trust Shailendra, he offered himself as a financial and investment advisor.

5.      Shailendra solicited Khan and Sabadia to invest in various real estate projects, some of which would come to be held as tenancies in common, and others

would be in limited liability companies, which would in turn own the subject real estate.

6.     Khan and Sabadia (Sabadia's investments were made through two trusts and a limited partnership) made substantial investments of tens of millions of dollars, including investments in the following projects:

     **a.**    **Investments made by the Sabadia Family Trust:**

        (1)    Tampa Property Partners

        (2)    Shi Investments One, LLC

        (3)    Shi Investments Two, LLC

        (4)    Shi Investments Three, LLC

        (5)    SR 42 and Harris Drive (Bethlehem Road)

        (6)    Highway 16 and 42, LLC

     **b.**    **Investments made by the Sabadia Family Irrevocable Trust:**

        (1)    Callaway 2297, LLC

        (2)    21 14th Street One-Third, LLC

        (3)    EBD Investment Group, LLC/PCB Eastbay 1130

        (4)    Highway 16 and 42, LLC

        (5)    PCB Four, LLC

        (6)    1400 West Peachtree, LLP

      (7)    Shi Investments Four, LLC

**c.    Investments made by the Sabadia Family Limited Partnership:**

      (1)    1400 Sabadia LLC – 1400 Peachtree L.P.

      (2)    EBD Investment Group, LLC/PCB Eastbay 1130

**d.    Investments made by Ishtiaq A. Khan**

      (1)    East Bay Development

      (2)    Tampa Property Partners

      (3)    Forsyth County (Georgia 400)

      (4)    Jonesboro 24 Acres

      (5)    Kathy Bray Property/Lovejoy

      (6)    PCB East Bay 1130

      (7)    Hampton

      (8)    M. D. Hodges

      (9)    Union City

      (10)    PCB Four, LLC

      (11)    Shi Investments One, LLC

      (12)    McDonough 35, LLC

      (13)   Hudson Bridge

      (14)   Highway 85, Fayette County

7.     In each of the properties or entities listed above, Shailendra was the Manager or Managing member.

8.     By virtue of his position of trust and confidence, and as Manager and Managing Member, Shailendra owed fiduciary duties to Khan and Sabadia.

9.     Shailendra breached his fiduciary duties, intentionally or otherwise, to Khan and Sabadia by (1) failing to account how invested funds were spent, (2) failing to invest the funds as solicited and/or directed, (3) self-dealing by paying himself commissions and other fees from the projects, (4) converting funds to his own benefit and use, (5) using the real property that was the subject of the investment to secure personal loans, and (6) failing to service loans as promised.

10.    As a result of the foregoing breaches of fiduciary duty, Khan and Sabadia were harmed inasmuch as each invested millions of dollars with Shailendra for the projects, and executed various bank notes and guarantees, including Exhibit "A" to Plaintiff's Complaint.

## Count III - Fraud

11.     Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

12.     The intentional breach of fiduciary duties, as described in Count II above, constitutes actual fraud.

13.     In addition to the allegations above, over the course of several years, Shailendra made many misrepresentations to Khan and Sabadia, including the following:

a.     The false balances in accounts as the result of kiting of checks were true balances.

b.     The money solicited from Khan and Sabadia would be used in the particular project that was the subject matter of the solicitation.

c.     Shailendra would properly maintain and keep accessible the books and records of each investment and account for the money solicited.

d.     Shailendra would not use the money for his personal use.

e.     The money invested was safe and secure.

f.     The profits from an earlier investment were rolled into the next investment.

g.      Shailendra's share in any investment would reflect his own pro rata share of actual funds contributed.

h.      Shailendra would not take fees from the investments, and the money or the proceeds generated would be returned to Khan and Sabadia when the projects were completed unreduced by fees paid to Shailendra.

14.     Contrary to the representations made above, which Khan and Sabadia relied upon, Shailendra did not use his own funds for his investments, failed to maintain proper accounting for investments, used invested or loaned funds for his personal use, and took fees and commissions indiscriminately.

15.     Shailendra knew the representations were false, when made.

16.     Khan and Sabadia justifiably relied on the representations, which were made continuously, and in response to inquiries such as "What is going on with X property."

17.     Whenever Shailendra requested that Khan and Sabadia sign notes, guaranties, or other bank documents, he represented to them, that he would see to it that the loans were taken care, that they would have no personal liability, and had nothing to worry about.

18.     Khan and Sabadia first discovered that Shailendra was not truthful with them in January 2010. However, the depth and scope of what was going on at PAB, and

with the PAB Officers was not initially discovered until September 2010, when documents relating to Shailendra's personal account at PAB were discovered.

19.    As a result of Shailendra's conduct and fraud, Khan and Sabadia have been damaged in an amount to be determined with certainty at trial.

## Count IV – Punitive Damages

20.    Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

21.    Based upon the allegations set forth above, and the conduct of Shailendra, which has been willful, wanton, malicious, fraudulent, and with reckless indifference to the consequences, Khan and Sabadia are entitled to recover punitive damages in an amount to be determined with certainty at trial.

## Count V – Attorney's Fees

22.    Khan and Sabadia incorporate all of the allegations made against others in this Answer, Counterclaim, and Cross Claim, particularly the allegations in the Fifth Defense in the Answer, as if fully restated herein.

23.    Shailendra has acted in bad faith, been stubbornly litigious, and has caused Khan and Sabadia unnecessary trouble and expense. As a consequence, Shailendra is liable for the expenses of litigation and reasonable attorney's fees incurred.

WHEREFORE, the defendants pray for judgment as follows:

AS TO COUNT ONE AGAINST PLAINTIFF FOR DECLARATORY RELIEF:

1.     For a declaration that the note sued upon, together with the related deed to secure debt, were obtained and induced by fraud and deceit and are cancelled and rescinded and rendered null and void and without effect; and

2.     For a further declaration that Plaintiff is not a holder in due course of the note sued upon and took the note subject to all claims and defenses the defendants have asserted against The Park Avenue Bank;

AS TO COUNT TWO AGAINST PLAINTIFF FOR SETOFF AND RECOUPMENT:

3.     For a judgment of setoff and recoupment against Plaintiff in an amount at least equal to any amount that might otherwise be owing Plaintiff on the note sued upon;

AS TO COUNT ONE AGAINST SHAILENDRA FOR CONTRIBUTION:

4.     For a judgment in an amount equal to Shailendra's pro rata share of any judgment rendered against the defendants;

AS TO COUNT TWO AGAINST SHAILENDRA FOR BREACH OF

FIDUCIARY DUTY:

5.      For compensatory damages in an amount proven at trial; and

6.      For interest on such damages at the maximum legally permissible rate;

AS TO COUNT THREE AGAINST SHAILENDRA FOR FRAUD AND

DECEIT:

7.      For compensatory damages in an amount proven at trial; and

8.      For interest on such damages at the maximum legally permissible rate;

AS TO COUNT FOUR AGAINST SHAILENDRA FOR PUNITIVE

DAMAGES:

9.      For punitive or exemplary damages;

AS TO COUNT FIVE AGAINST SHAILENDRA FOR ATTORNEY'S

FEES:

10.     For attorney's fees incurred in this case; and

AS TO ALL COUNTS

11.     For the Defendants' costs of suit; and

12.     For such other and further relief as the Court may deem just and

        proper.

This the 24th day of October, 2011.

/s/ Ryan Isenberg
Ryan L. Isenberg, Esq.
Georgia Bar No. 384899
Isenberg & Hewitt, P.C.
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
ryan@isenberg-hewitt.com
(770) 351-4400

/s/ Kevin King
Kevin S. King, Esq.
Georgia Bar No. 421000
7000 Peachtree Dunwoody Road
Building 15, Suite 100
Atlanta, Georgia 30328
kking@kevinsking.com
404-240-2020

Burton V. McCullough, Esq.
Pro Hac Vice
California Bar No. 41462
4205 Encinas Drive
La Cañada Flintridge, California 91011
lexchexrex@sbcglobal.net
818-952-5596

Attorneys for Defendants Khan and Sabadia

## Certificate of Service

This is to certify that I have this day filed the within and foregoing Amended Answer, Counterclaim, and Cross Claims, using the CM/ECF System, which will generate notice to the following counsel for Plaintiff and Defendant Shailendra:

John J. Richard
jrichard@taylorenglish.com

Donald P. Boyle
dboyle@taylorenglish.com

James M. Johnson
jjohnson@knightjohnson.com